IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

KIMBERLY DAWN FOSTER,

     **Plaintiff,**

**v.**                              **Civil Action No. 2:19-cv-00017**

ANDREW SAUL,[1]
COMMISSIONER OF SOCIAL SECURITY,

     **Defendant.**


## PROPOSED FINDINGS AND RECOMMENDATION

Plaintiff Kimberly Dawn Foster ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  By standing order entered on January 4, 2016, and filed in this case on January 9, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  (ECF No. 4.)  Presently pending before this Court are Plaintiff's Memorandum in Support of Judgment on the Pleadings (ECF No. 14), the

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

Commissioner's Brief in Support of Defendant's Decision (ECF No. 15), and Plaintiff's Reply to Brief in Support of Defendant's Decision (ECF No. 16).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 31 years old at the time of her alleged disability onset date and 34 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 26.)[2] She holds a master's degree. (*Id.* at 290.) Most recently, she worked as a middle school science teacher, and she has also taught high school science. (*Id.* at 473.) Claimant alleges that she became disabled on December 10, 2014, due to narcolepsy with cataplexy, migraine epilepsy, polycystic ovarian disorder, fibromyalgia, diabetes, bulging discs, gluten intolerance and severe allergies, clinical depression, and "spinal birth defect/narrow nerve channels/pain in legs." (*Id.* at 471.)

Claimant protectively filed her applications for benefits on December 16, 2014. (*Id.* at 446–59.) Her claims were initially denied on April 16, 2015, and again upon reconsideration on August 12, 2015. (*Id.* at 363–68, 370–75.) Thereafter, on September 4, 2015, Claimant filed a written request for hearing. (*Id.* at 378–79.) An administrative hearing was held before an ALJ on August 21, 2017, in Charleston, West Virginia. (*Id.* at 275–304.) On November 1, 2017, the ALJ entered an unfavorable decision. (*Id.* at 8–34.)

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 9.

Claimant then sought review of the ALJ's decision by the Appeals Council on December 12, 2017. (*Id.* at 445.) The Appeals Council denied Claimant's request for review on November 28, 2018, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

Claimant timely brought the present action on January 7, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 8) and a transcript of the administrative proceedings (ECF No. 9). Claimant subsequently filed her Memorandum in Support of Judgment on the Pleadings. (ECF No. 14.) In response, the Commissioner filed his Brief in Support of Defendant's Decision. (ECF No. 15.) Claimant then filed her Reply to Brief in Support of Defendant's Decision. (ECF No. 16.) As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Evidence of Seizures and Narcolepsy with Cataplexy Considered by ALJ

Claimant first presented to Dr. Alexander V. Otellin, M.D. ("Dr. Otellin"), a psychiatrist, on October 30, 2008, after a referral from another physician. (Tr. at 880.) She complained of insomnia, drowsiness during the day, night terrors, sleepwalking, and episodes of cataplexy. (*Id.*) She reported that the incidents were "provoked by anxiety which is provoked by school stress." (*Id.*) Dr. Otellin suspected that Claimant suffered from sleep apnea and narcolepsy and recommended a sleep study. (*Id.* at 883.) After the sleep study, Dr. Otellin diagnosed Claimant with narcolepsy and noted that Claimant

reported suffering from severe, daily symptoms of narcolepsy that "interfere[d] with her social and occupational activities." (*Id*. at 896–97.) He prescribed Ritalin. (*Id*. at 897.)

At Claimant's appointments throughout 2009, she reported improvement in her sleep and concentration and no episodes of cataplexy. (*Id*. at 815–17, 829–31, 854–55, 861–63, 902–03.) On December 28, 2009, Dr. Otellin stated that Claimant's narcolepsy symptoms were "well controlled except few [sic] stressful moments which made her sleepy." (*Id*. at 902.) Claimant's narcolepsy also remained "stable and under control" throughout 2010. (*Id*. at 859–60, 878–79.)

However, at her appointment on January 24, 2011, Claimant reported "feel[ing] sleepy and tired more often" and as though the Ritalin did not work as well as when it was first prescribed. (*Id*. at 818.) Dr. Otellin did not modify her Ritalin dosage at that time. (*Id*. at 819.) At her appointments on June 15, 2011, and September 12, 2011, Claimant reported that her narcolepsy was "more stable." (*Id*. at 849–50, 867–68.) She did not report any issues associated with her narcolepsy at her appointment on December 5, 2011, but she did state that she "was diagnosed with epilepsy" and suffered from headaches and seizures. (*Id*. at 886.)

On September 13, 2012, Claimant told Dr. Otellin that she "had a seizure" and her boss was trying "to use [her] illnesses against [her]." (*Id*. at 871.) She also reported feeling "under pressure" and that her narcolepsy was "getting worse." (*Id*.) Dr. Otellin continued treatment with Ritalin but increased the dosage of Claimant's Abilify. (*Id*. at 872.) However, on October 11, 2012, Claimant reported that she "had a cataplexy episode at work while under stress" and "had [a] sleep attack" and was placed on "medical leave." (*Id*. at 876.) Dr. Otellin prescribed Xyrem. (*Id*. at 877.) At her appointments on November 5, 2012 and December 4, 2012, Claimant reported additional episodes of

4

cataplexy triggered by workplace stress. (*Id.* at 884, 888.) She had not yet used the Xyrem Dr. Otellin prescribed, but Dr. Otellin nonetheless stated that Claimant "show[ed] slight treatment response." (*Id.* at 884–85, 888.)

After beginning to take Xyrem, Claimant reported to Dr. Otellin at her appointment on January 30, 2013, that she was sleeping better and was "more alert." (*Id.* at 820.) Although she felt that the Xyrem was not as effective after taking it for a few weeks as it was the first week, she reported "need[ing] less Ritalin." (*Id.*) Dr. Otellin increased her dosage of Xyrem several times after Claimant reported work stress and feeling "sleepy during the day." (*Id.* at 821, 834–35.) At her appointment on July 3, 2013, Claimant reported that the increased dosage "helps" and that her narcolepsy symptoms had decreased. (*Id.* at 851.) She continued to report improvement and decreased symptoms when she used Xyrem as prescribed. (*Id.* at 856, 864, 873.)

On December 2, 2013, Claimant presented to her primary care physician, Dr. E. Kristi Hensley, M.D. ("Dr. Hensley"). (*Id.* at 948.) Claimant reported having a seizure the previous week and going to the emergency room, where she was discharged with pain medication. (*Id.*) She also complained of headaches. (*Id.*) A few days later, on December 5, 2013, Claimant presented to Dr. Hensley complaining that "she felt that she was going to have a seizure but did not." (*Id.* at 950.) When she returned to Dr. Hensley on December 9, 2013, Dr. Hensley diagnosed her with pharyngitis. (*Id.* at 951.) Dr. Hensley referred Claimant to neurologist Dr. Mohammad Rana, M.D. ("Dr. Rana"). (*Id.* at 950.) Claimant presented to Dr. Rana on December 24, 2013, complaining of "spells," which she described as "staring, inattention, state of confusion without shaking," that had occurred for two to three years. (*Id.* at 915.) Dr. Rana ordered an EEG test. (*Id.* at 919.)

5

At her appointment with Dr. Otellin on February 18, 2014, Claimant reported having seizures. (*Id.* at 825.) Several days later, on February 24, 2014, Claimant presented to the Saint Francis Hospital emergency room complaining of seizures, confusion, and pain in her head and neck area. (*Id.* at 668.) She stated that her seizures had increased over the previous two weeks and occurred at work. (*Id.*) No seizure activity was detected, however, and Claimant was discharged and instructed to follow up with Dr. Hensley and Dr. Rana. (*Id.* at 675, 682.) At her appointment with Dr. Rana on April 14, 2014, Claimant reported that she was having several spells per week that were triggered by noise and scents. (*Id.* at 921.) She also reported worsening narcolepsy symptoms to Dr. Otellin on April 16, 2014, and resulting "problems at school." (*Id.* at 836.) However, Dr. Otellin did not make any changes to her medications. (*Id.* at 837.) At her next two appointments with Dr. Otellin, on May 13, 2014, and September 12, 2014, Claimant reported "no cataplexy lately." (*Id.* at 839, 869.)

However, on November 3, 2014, Claimant presented to Dr. Hensley and complained of "more episodes over past two weeks" that were triggered by "axe body spray and scented hand sanitizer." (*Id.* at 961.) Dr. Hensley recommended that Claimant avoid triggering smells and wear a mask "when known triggers are in the air." (*Id.*) At her appointment with Dr. Otellin on December 8, 2014, Claimant reported worsening narcolepsy and episodes of cataplexy that "happened several times over last [sic] few weeks" and "significantly interfere[d] with her function, especially at work." (*Id.* at 890.) Claimant also reported that the school recommended a yearlong medical leave. (*Id.*) On December 10, 2014, Claimant requested that Dr. Hensley write her a "letter for disability due to seizures and cataplexy" so that she could begin her medical leave. (*Id.* at 963; *see id.* at 1179.)

At her appointment with Dr. Otellin on January 9, 2015, Claimant reported "having problems." (*Id.* at 812.) Dr. Otellin noted that Claimant's "narcolepsy is not improved," but he did not modify her medications. (*Id.* at 812–14.) Claimant reported no cataplexy at her appointment on February 4, 2015, although Dr. Otellin noted that her "condition is disabling for the job she has been [doing] (teaching in public schools)." (*Id.* at 822–23.) At her next two appointments on April 21, 2015, and June 2, 2015, Claimant reported not having Xyrem and feeling "very sleepy during a [sic] day." (*Id.* at 843, 845.)

On June 3, 2015, Claimant presented to Dr. Darshan Dave, M.D. ("Dr. Dave"), a neurologist, complaining of headaches and seizures. (*Id.* at 905–06.) Dr. Hensley referred Claimant to Dr. Dave after Claimant reported to Dr. Hensley that her seizures were "increasing." (*Id.* at 1198.) Indeed, on June 4, 2015, Claimant told Dr. Hensley that she had a seizure on May 24 and "several 'little ones' since then." (*Id.* at 913.) Dr. Dave noted that Claimant's narcolepsy medications "can lead to seizures." (*Id.* at 906.) Claimant returned to Dr. Dave on July 7, 2015, reporting no changes in her headaches from the previous visit. (*Id.* at 1537.) Dr. Dave prescribed Inderal. (*Id.* at 1538.) However, Claimant told Dr. Hensley that she did not take it because "she [was] afraid it [would] drop her [blood pressure]." (*Id.* at 1201.)

Claimant reported to Dr. Hensley on August 24, 2015, that her narcolepsy was "worse." (*Id.* at 1204.) At her next appointment with Dr. Otellin, on September 2, 2015, Dr. Otellin recommended restarting Xyrem at a "slightly lower dose." (*Id.* at 1031.) Claimant later reported to Dr. Otellin that she had stopped taking Xyrem because "it made [her] sleepwalk." (*Id.* at 1042.) As a result, Dr. Otellin discontinued Xyrem. (*Id.*)

On January 11, 2016, Dr. Hensley wrote a letter stating that Claimant "is having episodes of seizures and cataplexy which makes it difficult to function in a teaching

position" and recommending that Claimant not be around odors. (*Id.* at 912.) Nonetheless, at her appointment with Dr. Otellin on April 26, 2016, Claimant reported feeling "normal" and "not sleepy all the time." (*Id.* at 1002.) Dr. Otellin noted that she had experienced "a slight apparent response to treatment" and did not make changes to her medications. (*Id.* at 1002–04.)

On August 11, 2016, Claimant presented to Dr. Vikram Shivkumar, M.D. ("Dr. Shivkumar"), a neurologist, complaining of seizures and "spells" during which she lost consciousness or became very tired. (*Id.* at 1104.) Claimant reported that the seizures were "triggered by noise, lights and certain colognes" and that she had never had a seizure at home. (*Id.*) Dr. Shivkumar prescribed Keppra and ordered an EEG. (*Id.* at 1107.) The EEG was conducted on August 22, 2016, and although Claimant reported feeling "confused" and "sleepy" at one point during the test, the results were normal "for the awake and sleep states," with the "absence of epileptiform activity or periodic activity or focal abnormalities." (*Id.* at 1102–03, 1151–52.) Claimant returned to Dr. Shivkumar for a follow-up appointment on October 6, 2016. (*Id.* at 1097.) She reported episodes several times per week even with Keppra. (*Id.*) Dr. Shivkumar told Claimant to stop taking Keppra and "follow up with psychiatry." (*Id.* at 1100.)

On February 1, 2017, Dr. Hensley noted that Claimant "is prone to seizures when she is standing for prolonged periods in enclosed spaces with any smells like cologne." (*Id.* at 1248.)

 2. *Evidence of Seizures and Narcolepsy with Cataplexy Not Considered by ALJ*

At her October 31, 2016 appointment with Dr. Otellin—Claimant's first since April 26, 2016—she reported being in the hospital due to her seizures. (*Id.* at 249.) She explained that the seizures were triggered by a "strong smell." (*Id.*) Dr. Otellin noted that

Claimant's cataplexy was "well controlled." (*Id*.) He referred Claimant to another physician "to find out possible link between her reaction to strong odors and seizures." (*Id*. at 250.) On January 30, 2017, Claimant reported having a seizure the previous week "in a furniture store" due to "some kind of very strong smell." (*Id*. at 251.) Dr. Otellin concluded that Claimant "had a cataplexy episode, triggered by strong odor." (*Id*.) He did not modify her medications. (*Id*. at 252.) At her next appointment on April 26, 2017, Claimant reported no recent seizures, but on July 24, 2017, Claimant stated that she experienced "episodes of cataplexy when [she] saw [her] niece and got very excited." (*Id*. at 254, 257.) Dr. Otellin adjusted her medications. (*Id*. at 258–59.) However, on October 19, 2017, Claimant reported being unable to "get the full dose of Ritalin because of the insurance." (*Id*. at 261.) On November 21, 2017, and January 18, 2018, Claimant stated that she was "not doing better" and experienced "cataplexy at least three times a week" at home. (*Id*. at 264, 267.) Dr. Otellin did not modify her medications at either appointment. (*Id*. at 265, 268–69.)

### 3. *Testimony of Medical Expert Dr. David Owens, M.D.*

At the hearing, the ALJ enlisted the aid of a medical expert, Dr. David Owens, M.D. ("Dr. Owens") to evaluate Claimant's functional limitations. (*Id*. at 283–87.) Dr. Owens testified, based on a review of the medical evidence of record, that Claimant suffered from fibromyalgia, obesity, chronic low back pain and chronic neck pain, right ulnar neuropathy, asthma, hypothyroidism, diabetes, headaches, narcolepsy with cataplexy, and seizures. (*Id*. at 284–85.) Of particular relevance here, Dr. Owens testified that Claimant's narcolepsy with cataplexy was "not well controlled despite several medications." (*Id*. at 285.) He further opined that Claimant suffered from "non-epileptic

spells . . . two or three episodes per week with staring or alteration of consciousness lasting about 20 minutes triggered by noise, or lights, or smells." (*Id.*)

When asked by the ALJ if "a listing" was "met or equaled," Dr. Owens replied that Claimant "would [not] meet or equal a listing given the combination" of her impairments. (*Id.*) As to Claimant's residual functional capacity, Dr. Owens opined,

> I think she could lift and carry about 20 pounds occasionally, ten pounds more frequently. I think she could sit for a total of six hours in an eight hour day. I think standing would be limited to about four hours, and walking I think could be no more than two hours in an eight hour day. I think that she could do ramps and stairs occasionally. She would not be able to climb ladders and do any climbing of that sense, but I think she could balance, bend, stoop, crouch, and crawl occasionally. I think that she could do hand controls frequently, foot controls could be done frequently. In terms of environmental limitations I think she would have to avoid unprotected heights and moving mechanical parts, and I think she would have to avoid extremes of heat, and cold, and wetness, and fumes, and she would not be able to do any commercial driving I think because of the cataplexy episodes.

(*Id.* at 285–86.)

Claimant's representative also questioned Dr. Owens. (*Id.* at 286–87.) She first asked him if "there would likely be an interruption in [Claimant's] ability to get through a normal eight-hour day in a normal week." (*Id.* at 286.) Dr. Owens replied that "there'd be times that [Claimant] would have to miss work" if she was experiencing "spells" or cataplexy and that Claimant's "spells would interfere with her work routine." (*Id.* at 286.) Claimant's representative next asked Dr. Owens "how often that might happen in a typical

week or a typical month." (*Id.*) Dr. Owens replied, "It's not well documented where it says. I think it would occur a couple times a week so . . . maybe six or eight times a month." (*Id.* at 286–87.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence.

*See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable

impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an

13

adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision. (Tr. at 14.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability. (*See id.*) He found that Claimant's report of non-epileptic or pseudo-seizures, headaches, diagnosis of narcolepsy, report of degenerative disc disease/arthritic changes of the spine, right ulnar neuropathy, report of fibromyalgia, asthma, diabetes, and obesity constituted "severe" impairments. (*Id.* at 14–16.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16–18.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform a range of light work." (*Id.* at 18.) Specifically, he determined that Claimant "can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can sit for six hours in an eight-hour workday; can stand for four hours in an eight-hour workday; can walk for two hours in an eight-hour workday; can perform postural activities occasionally but should not climb ladders, ropes,

or scaffolds; can frequently use hand controls and foot controls; should have no exposure to heights, moving machinery, hazards, hot and cold temperature extremes, wetness, fumes, odors, and dust; should not perform commercial driving; and[] would be afflicted with chronic pain noticeable to herself at all times but can maintain attention and concentration in two hour increments with normal morning, lunch, and afternoon breaks." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was unable to perform her past relevant work. (*Id.* at 25.) He noted that she is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.* at 26.) Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a vocational expert ("VE") to aid in his finding that Claimant is capable of working as a merchandise marker, laundry folder, or hand packager. (*Id.*) As a result, the ALJ concluded that Claimant was not "under a disability . . . from December 10, 2014, through the date of this decision." (*Id.* at 27.)

## II.   *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it

contains 'sufficient evidence' to support the agency's factual determinations." *Id*. (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id*. (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the Appeals Council erred by denying her request for review and failing to consider new evidence from one of her treating physicians. (ECF No. 14 at 8–11.) She further asserts that the ALJ did not perform a complete function-by-function analysis when he conducted his RFC assessment. (*Id*. at 11–14.) Claimant asks this Court to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id*. at 15.) The Commissioner responds that the Appeals Council's denial of Claimant's request for review is not a final agency action reviewable under 42 U.S.C. § 405(g), that the Appeals Council correctly determined that the newly submitted evidence would not affect the ALJ's decision, and that the ALJ properly performed the RFC assessment. (ECF No. 15 at 11–17.) Claimant replies that she is not required to prove that evidence is "new and material," that the ALJ subpoenaed the evidence at issue, and that the ALJ's RFC assessment was incomplete. (ECF No. 16 at 1–4.)

### A. *Additional Medical Records from Dr. Alexander Otellin, M.D.*

Claimant argues that the Appeals Council should have remanded her claims to the ALJ for consideration of additional medical records submitted by Dr. Otellin, a

16

psychiatrist who treated Claimant.  (ECF No. 14 at 9.)  As an initial matter, to the extent Claimant challenges the Appeals Council's denial of her request for review, the denial itself is not reviewable under 42 U.S.C. § 405(g).  *See Smith v. Berryhill*, 139 S. Ct. 1765, 1773 (2019) (explaining that § 405(g) permits judicial review of "final decision"); *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000) (noting that when Appeals Council "denies the request for review, the ALJ's opinion becomes the final decision" of Commissioner); *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (explaining that Appeals Council does not make "decision" under applicable regulations when it denies request for review).  Instead, this Court, taking into account the newly submitted evidence considered by the Appeals Council, reviews the ALJ's decision for substantial evidence, just as it would do when no additional evidence is submitted.  *See Meyer*, 662 F.3d at 707; *Flesher v. Colvin*, No. 2:14-cv-30661, 2016 WL 1271511, at *9 (S.D.W. Va. Mar. 31, 2016) (quoting *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc)).  In doing so, this Court "focus[es] on determining whether [the] new evidence is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports."  *Flesher*, 2016 WL 1271511, at *9 (internal quotation marks omitted).  Remand is appropriate only if the newly submitted evidence "impugn[s] the integrity of the [ALJ's] decision."  *Meyer v. Colvin*, 754 F.3d 251, 257 (4th Cir. 2014).

Claimant suggests that the ALJ's decision is not supported by substantial evidence because the additional records from Dr. Otellin demonstrate that she continued to experience seizures and episodes of cataplexy that "would cause additional environmental and off-task limitations not considered by the ALJ in his RFC assessment."  (ECF No. 14 at 10.)  In other words, she argues that the records would have impacted the ALJ's

decision, a fact she asserts is illustrated by the subpoena the ALJ issued for them. (*Id.* at 9; ECF No. 16 at 2–3.) The problem with Claimant's argument, however, is that the ALJ issued the subpoena not because he identified some gap in the evidence but because Claimant herself requested the subpoena. (*See* Tr. at 280–81.) At the hearing before the ALJ, Claimant's representative reported that she and Claimant had experienced difficulty in obtaining records from Dr. Otellin, which Claimant's representative maintained were related to Claimant's diagnosis of narcolepsy with cataplexy. (*Id.* at 280.) Claimant's representative then requested the ALJ's assistance in securing those records. (*Id.*) The ALJ agreed to "keep the record open to try to get a subpoena for Dr. Otellin" and issued the subpoena on August 23, 2017. (*Id.* at 281, 441–44.)[3] Nowhere does the ALJ indicate that the records from Dr. Otellin were necessary to his consideration of whether Claimant was entitled to benefits. Indeed, to that effect, the ALJ stated, "A doctor ignored a subpoena and the representative requested that the record be closed. *The case is adequately developed.*" (*Id.* at 11 (emphasis supplied).)

More importantly, the information Claimant asserts can be gleaned from the additional records from Dr. Otellin—*i.e.*, that Claimant experienced seizures and episodes of cataplexy after exposure to "strong odors"—was available to the ALJ at the time he issued his decision. (*See* ECF No. 14 at 10.) For example, Claimant told Dr. Rana, her neurologist, on April 14, 2014, that she was having seizures caused by smells. (Tr. at 921.) She told her primary care physician, Dr. Hensley, the same thing on November 3, 2014. (*Id.* at 961.) Dr. Hensley also noted on February 1, 2017, that Claimant experienced

---

[3] Of note, if the ALJ had not issued the subpoena upon Claimant's request, Claimant surely would contend that the ALJ did not comply with his obligation to fully develop the record. *See Pearson v. Colvin*, 810 F.3d 204, 210 (4th Cir. 2015) ("[A]n ALJ has a duty to investigate the facts and develop the record independent of the claimant or his counsel." (citing *Cook v. Heckler*, 783 F.2d 1168, 1173–74 (4th Cir. 1986))).

seizures triggered by "any smells like cologne." (*Id.* at 1248.) And Claimant told Dr. Shivkumar, another neurologist, on August 11, 2016, that she had seizures "triggered by noise, lights and certain colognes." (*Id.* at 1104.) Therefore, the medical evidence before the ALJ included information that Claimant had seizures brought on by smells, both prior to her alleged onset date and during the period covering the additional records from Dr. Otellin.

Claimant also argues that the additional records from Dr. Otellin demonstrate that her "cataplexy continued to be unpredictable and treatment-resistant" because she experienced episodes of cataplexy "triggered by a strong odor" and "when becoming excited" and Dr. Otellin made changes to her medications. (ECF No. 14 at 10.) Again, similar evidence was before the ALJ at the time he issued his decision. When Claimant was first diagnosed with narcolepsy in 2008, Dr. Otellin prescribed Ritalin to treat it, but he prescribed Xyrem in 2012 after Claimant "had a cataplexy episode at work while under stress." (Tr. at 876–77, 897.) Over the following years, Dr. Otellin modified Claimant's Xyrem dosage several times and eventually discontinued it. (*Id.* at 821, 834–35, 1031, 1042.) Claimant also used Keppra prescribed by Dr. Shivkumar. (*Id.* at 1107.) Throughout this time, Claimant had periods during which she experienced frequent seizures or episodes of cataplexy and periods during which she responded well to her medications and her condition was stable. (*See, e.g.*, *id.* at 668, 812, 815–17, 820, 825, 829–31, 836, 839, 851, 854–55, 859–63, 869, 871, 876, 878–79, 884–85, 888, 890, 896– 97, 902–03, 913, 921, 948, 961, 1002–04, 1097, 1104, 1198, 1204.) Dr. Owens, the medical expert at the hearing, also testified that Claimant's narcolepsy with cataplexy was "not well controlled despite several medications." (*Id.* at 285.)

Because the information Claimant contends is contained within the additional records from Dr. Otellin was documented in the medical evidence before the ALJ, there is no "evidentiary gap" that would render the additional records from Dr. Otellin necessary to the ALJ's decision. *See Meyer*, 662 F.3d at 707. The ALJ considered Claimant's reports of "spells" and sensitivity to smells when assessing Claimant's RFC. (*See* Tr. at 21–22.) Accordingly, the undersigned **FINDS** that remand is not required. *Flesher*, 2016 WL 1271511, at *9 ("Where no such conflict [between the newly submitted evidence and the evidence previously in the record] is present, the case can be decided on the existing record without remand.").

B. *RFC Assessment*

Claimant next argues that the ALJ failed to perform a complete function-by-function analysis when conducting his RFC assessment and did not adequately consider the impact of Claimant's narcolepsy and seizures on her daily functioning. (ECF No. 14 at 11–14.) When conducting the RFC assessment, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (internal quotation marks omitted). Those functions include an assessment of the claimant's physical abilities, mental abilities, and other work-related abilities that may be affected by the claimant's impairments. *Id.* at 636 n.5 (citing 20 C.F.R. § 416.945); *see* 20 C.F.R. § 404.1545. In addition, the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Mascio*, 780 F.3d at 636.

The ALJ properly conducted his RFC assessment of Claimant. When considering the impact of Claimant's alleged neurological conditions on her ability to work, the ALJ reviewed the medical evidence of record, noting that "studies of the head/brain were negative" despite Claimant's allegations of headaches, and that Claimant had "no medically determinable epileptic disorder" and had normal EEG testing. (Tr. at 22.) The ALJ also explained that the medical evidence of record revealed no impact on Claimant's ability to "perform fine and gross movements effectively or ambulate effective[ly]" and "no evidence of significant mental status or cognitive deficits." (*Id.*) He noted that this evidence, which reflected "conservative" treatment for Claimant's "alleged 'spells', headaches, narcolepsy, and/or right ulnar neuropathy," was inconsistent with Claimant's representations about her symptoms. (*Id.*) Based on these conclusions, the ALJ found that Claimant "is capable of . . . light exertional work, including the ability to perform postural activities occasionally but not climb ladders, ropes, or scaffolds, to frequently use hand and foot controls but not perform commercial driving, to avoid heights, moving machinery, hazards, temperature extremes, fumes, odors, and dust, and to maintain attention and concentration in two hour increments with normal breaks." (*Id.*) Put simply, the ALJ did precisely what was required. *Mascio*, 780 F.3d at 636; *see Monroe v. Colvin*, 826 F.3d 176, 187–88 (4th Cir. 2016).

The crux of Claimant's argument is instead that the ALJ misunderstood "the nature of [her] impairments" because narcolepsy is often not accompanied by clinical findings, and the ALJ disregarded Claimant's testimony about her symptoms. (ECF No. 14 at 12–13.) She asserts that the ALJ's RFC assessment "did not account for the off-task behaviors and absenteeism that could be expected from the combination of [her] daytime sleepiness, cataplexy, and pseudo-seizures." (*Id.* at 12.) But these alleged limitations

derive from Claimant's own representations about her symptoms, which the ALJ found not entirely credible because they were not reflected in the medical evidence of record. (*See* Tr. at 22 ("Records failed to document a specific pattern, frequency, and duration of symptoms consistent with or supportive of that alleged by [Claimant].").) The ALJ is not required to accept Claimant's representations about the manner in which her symptoms affect her daily functioning if those representations "are inconsistent with the available evidence." *Dunn v. Colvin*, 607 F. App'x 264, 273–74 (4th Cir. 2015) (quoting *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996)).

In assessing Claimant's credibility, the ALJ summarized Claimant's statements about her limitations and her hearing testimony but concluded that the medical evidence of record did not "support [the alleged] frequency and intensity" of her symptoms that Claimant described. (*Id.* at 19.) To that end, the ALJ reviewed the medical evidence of record and found that it reflected "unimpressive and relatively benign objective findings" and "conservative" treatment related to Claimant's neurological conditions, in addition to the negative brain scans and normal EEG testing that Claimant insists can be expected in individuals with narcolepsy (ECF No. 14 at 13). (Tr. at 22.) The ALJ further noted that Claimant's statements about her daily activities were inconsistent with the alleged impact of her symptoms. (*Id.* at 19.) Contrary to Claimant's suggestion, the ALJ may consider "the lack of objective medical evidence" in "reject[ing] a claimant's allegations of intensity and persistence" of symptoms. *Plummer v. Berryhill*, No. 2:17-cv-03591, 2018 WL 3800247, at *15 (S.D.W. Va. July 17, 2018), *adopted by* 2018 WL 3795271 (S.D.W. Va. Aug. 9, 2018). The medical evidence of record does not include a single documentation by any of Claimant's treating physicians that Claimant experienced drowsiness, episodes of cataplexy, or pseudo-seizures during an appointment. Relatedly, "it is appropriate for

22

the ALJ to consider the conservative nature of a plaintiff's treatment—among other factors—in judging [her] credibility." *Dunn*, 607 F. App'x at 273. The ALJ's review of the medical evidence of record reflected "no evidence of any form of increasingly intensive neurological treatment, including no regularly required emergent or inpatient care and no surgical intervention, consistent with the degree of neurological impairment alleged." (Tr. at 22.)

Even so, the ALJ considered Claimant's "self-reports, such as with respect to pain and 'spells,'" in assessing her RFC. (*Id.*) The ALJ's RFC assessment of Claimant is similar to that of Dr. Owens, the medical expert who testified at Claimant's hearing. (*Compare id.* at 18, *with id.* at 285–86; *see id.* at 24.) Dr. Owens testified that Claimant's narcolepsy with cataplexy was "not well controlled despite several medications." (*Id.* at 285.) He accepted Claimant's statements that she had "two or three episodes per week with staring or alteration of consciousness lasting about 20 minutes triggered by noise, or lights, or smells." (*Id.*) Dr. Owens also testified, based on questioning by Claimant's representative, that Claimant's "spells would interfere with her work routine" if she experienced cataplexy. (*Id.* at 286.) Still, Dr. Owens concluded that Claimant "would have to avoid unprotected heights and moving mechanical parts, and . . . extremes of heat, and cold, and wetness, and fumes, and she would not be able to do any commercial driving . . . because of the cataplexy episodes." (*Id.*) Consistent with his assessment of Claimant's credibility, the ALJ accorded "partial weight" to Dr. Owens's opinions because his "testimony regarding interference with work activities was speculative and . . . not well documented or supported by the medical record" and his estimation as to the frequency of Claimant's "spells" was likewise "speculation." (*Id.* at 24.) The ALJ was entitled to do

so.  *See Chambliss v. Massanari*, 269 F.3d 520, 523 n.1 (5th Cir. 2001) (stating that ALJ has discretion to decide "relative weight to be given" to testimony of medical expert).

In sum, the ALJ's RFC assessment is consistent with his findings about her functional limitations in light of the medical evidence of record.  As relevant here, the ALJ determined that Claimant did not have "significant mental status or cognitive deficits" because she was "routinely alert and oriented in all areas" and there were "benign" clinical findings "in areas such as alertness, orientation, mood, affect, thought content and processes, calculations, speech, memory, attention, concentration, and behavior."  (*Id.* at 15, 22.)  He noted "no more than mild difficulties in concentrating, persisting, or maintaining pace" and no difficulties in the other areas of mental functioning.  (*Id.* at 16.)  These findings are supported by substantial evidence.  Accordingly, the undersigned **FINDS** that there is no error in the ALJ's RFC assessment of Claimant.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 14), **GRANT** the Commissioner's request to affirm his decision (ECF No. 15), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and

Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Goodwin.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: October 16, 2019

Dwane L. Tinsley
United States Magistrate Judge

25